May it please the Court, my name is Tim Sandefur. I represent the appellants in this case. I'd like to reserve five minutes for rebuttal, if I may. May it do so, counsel. Just watch the clock. This Court has held that the standard required of occupational licensing laws is that they must be rationally related, not merely to a legitimate State interest, but specifically to an applicant's fitness or capacity to practice the profession itself. The licensing scheme in this case fails that test, one, because it requires licenses for people who treat pigeon, rat, and mouse infestations, but not other kinds of vertebrate pests for no rational reason, and two, because the licensing examination has no questions on it about pigeons and virtually none about rats and mice, even though it's required of any person who goes into the business of treating these pests without pesticides. Now, the law works in three steps. First, anybody who deals with pests in structures must have a license. That would be rationally related to a legitimate State interest. The second step, the law says there's an exemption. If you don't use pesticides, you don't need the license. Again, that would be rationally related to a legitimate State interest. We need to protect people from dangerous chemicals, so we'll require the people who use them be licensed. But then the third step is the definition of vertebrate pests in Section 8555G of the Business and Professions Code, which says it does not include pigeons, rats, and mice, and what that means is it leads to the irrational result that if you put spikes on a building to keep pigeons from landing on it, you need a license, but if you put the same spikes on the same building to keep seagulls off of it, you don't need a license. Now, this is not rational, and there's no rational justification for the law that is not contradicted by the way it actually works in practice. For example, the district court said that perhaps license is required for pigeon work, but not seagull work because pigeons are more common. There's no evidence in the record to support that, but let's, if we assume that that's true, we would expect to find questions on the examination that have to do with pigeons, and yet there aren't any. There are 200 questions on this licensing exam. Zero of them are about pigeons. There are seven questions about non-pesticide rat exclusion, six about mouse exclusion, and then one and a half. Is your focus in terms of remedy at this stage some sort of order compelling the state to revise its examination, or is this part of a larger interpretation as to rational basis? It has to be understood as a whole, and if the court were to order that, that would solve only half of the problem. It would not resolve the problem that the license is only required for people who treat some pests and not for others. We think that the most appropriate remedy is simply to draw, if you draw a line through 8555G, you end up with a rational result where the law requires a license if you're using dangerous chemicals, requires you to know about those chemicals and know their dangers, and the law doesn't require that license if you don't use those chemicals. But we have now an issue. Isn't that pretty much the end of the analysis at this point? I really get very nervous about inviting Federal courts to come in and micromanage these agencies, even suggesting that they add certain questions to the exam. Isn't that really beyond our scope? It would certainly be beyond the court's scope to try and micromanage and to rewrite the examination. That's not what we're seeking. We're saying that while certainly the State has broad latitude, that's what rational basis is all about, but there are points where rational basis falls apart, and that is when you have an examination that tests a person, imposes severe education and licensing requirements on a person to learn skills that that person does not use. For instance, in the Cornwell case where the hair braiders were being required to get barber licenses. And what the district court found in that case was, barbers do skills A through Z, but hair braiders do skill A and a little bit of skill B. They don't use chemicals, they don't cut hair, they don't do hairstyles, and it's irrational to require them to go through two years of training, learning about these chemicals, learning about these hairstyles, when all they want to do is braid hair. Let me go right ahead. My law court came up with an interesting analogy, and I want to know your take on it. And that is, he said, well, we all had to take trust in the States to pass the bar, even though none of us is doing trust in the States. And that's a pretty complicated area of the law, and it takes a long time to learn it and study it and pass that examination, which includes lots of things. We don't, well, certainly not, as a federal judge, I'm certainly not doing a lot of California State law. So how, I mean, so why can't the State, I mean, would you be suggesting that the State bar exam has no rational basis because it tests people on things that are irrelevant? No, certainly not. In fact, the Cornwell court went into that analogy and said, it would not be rational to require a lawyer to learn architecture and to pass the architect's practice exam, even though there might be cases where a lawyer would need that information, lawyers representing architects, perhaps. But that goes too far and puts too much of a burden on a person to learn irrelevant skills. With lawyers, as we know, lawyers are officers of the court. They're subject to being assigned to criminal cases, even if they deal only in real estate transactions, things like that. So it is certainly reasonable to say, lawyers need to know these skills because a lawyer will be called on to exercise those skills. And if they're going to go into business, they have to know that practice. But not all lawyers. Breaks down a little bit, doesn't I? I mean, what the reason for the question, I suppose, on the bar exam is that if you're a general practitioner and someone walks in with what, in reality, is a trust in the State's problem, that you know enough about the law to be able to tell them that you're not qualified to handle that. That leads to my my question. Is your client listed in the yellow pages under pest control? You know, I don't know. Let's assume that he is, and I've got a problem with pigeons or rats at my building or my house. And I call your client up, and he comes out and explains how he can use barriers to prevent these things from coming in my house, which I don't want in my house or my commercial building. And in the course of talking with him, I say, well, what about pesticides? Will they do the same thing? Now, can he answer that question? Now, that consumer education, the consumer education rationale was relied on by the district court. But what's important here is that the defendants expressly disclaimed that as a rationale for the law. They said consumer education is not part of the occupational analysis and is not present on the examination. So the licensing exam does not evaluate whether a person can do that. And if that were the rational justification for the law, again, there's no reason to require it for people who deal with pigeons, but not for people who deal with any other kind of pest bird or any other kind of vertebrate pest. If we recur to the lawyer analogy, lawyers are not required to take the patent bar unless they want to go into patent law. And that's because to require this degree of education and testing and standards would be very burdensome for people who don't really use those kinds of skills. So the legislature has drawn these lines and said, well, if you're going to do this practice, you need to know these skills, and if you're going to do that practice, you need to know those skills.  Sotomayor, I cannot patent lawyers try patent lawsuits. Well, perhaps, but my point is not perhaps. I did. Okay. The point I'm trying to make, Your Honor, is that the State has leeway, plenty of leeway, to design licensing regimes to test the skills that are appropriate. And as long as they satisfy the Dittman standard, as this Court said, those licensing requirements must be rationally related to a person's fitness or capacity to practice. But a person could take this examination, get a license, go to work on a pigeon problem, and have no idea about anything about pigeons because there's nothing on the examination that requires a person to know this information. So this licensing examination and law do two things that are kind of paradoxical. At one point, it treats people who do different things as though they're the same. It treats people who don't use pesticides and people who do use pesticides as though they're the same while ignoring important differences between them. And that's what happened in Cornwell with the hair braiders being treated like barbers. And it's what happened in Craig Miles, the casket case, where people were just selling coffins, they weren't officiating at funerals, and yet the State of Tennessee was requiring them to spend two years learning how to handle dead bodies, learning how to officiate at funerals, and the Sixth Circuit Court of Appeals said that's not rational. So on one hand, it lumps together people who are different in important ways. But at the same time, it treats people who are similarly situated differently for no rational reason. So the State could not have a differing, could not have the same licensing requirements for hunters who use bows and those who use long weapons? Certainly they could, but as the Cornwell court put it, the State couldn't require lawyers to take architect's license exams. And again, we're not trying to get into such fine distinctions. No fine distinction is necessary here. We have a licensing examination that has 200 questions on it, of which 16 have any relevance to the plaintiff's practice. It's about you. But you've told Judge O'Scanlan that no part of your request for relief asks that we direct the State to modify the exam. No. We're simply showing how the examination works in conjunction with the licensing requirement to result in an irrational licensing, occupational licensing regime. They work as a whole. And what we have is people who deal with pigeons are required to undergo all of this training when they don't use pesticides and to pass an examination that has nothing on it about pigeons, whereas a person shows up to do a seagull job on the same building using the same technology for the same reasons and is not required to have any educational or testing or licensing requirements at all. So one of the problems with your reference to Cornwall, it seems to me, is that there was more than an implication that those regs were designed to protect the cosmetology industry. That's right. Is there any innuendo with respect to the regs here on very little control that there's some sort of protectionism going on? Absolutely. There is, Your Honor. Absolutely there is. In fact, the undisputed evidence in the record supports only that conclusion. The State's own expert witness testified at length under oath about the origin of this licensing requirement and testified that that is exactly what happened. Well, who's benefited? Who are the? The pest control companies that already are licensed to practice in this field. What happened was, first the law required a license for everybody, but then the proposal was aired to say, well, if they're not using pesticides, they shouldn't need a license. And when that happened, as the State's expert witness, the only witness they offered testified, what happened was those who had licenses went to Sacramento and demanded that the law remain in place, the licensing requirement remain in place for the most common pests, the pests that are the biggest part of the business. And he said that they, that the law was designed to, quote, divide up the trade and to ensure that those who had licenses were protected from fair competition by outsiders. Now, we submit that, that the Craig Miles, the Sixth Circuit decision in Craig Miles shows how a court should analyze this problem. Once we've dealt with the rational justifications for the law that had been offered by the State, and those were that it, that pigeons are the most common pests, but the problem with that is the test doesn't evaluate a person's knowledge of that. The second one was, well, people might need to know about pesticides that had been applied by other people, and if that's the case, there's no rational justification for requiring the law, the license only for people who deal with pigeons and not for people who deal with seagulls. And then the third one was the consumer education rationale, which, again, is not present on the examination and was expressly disclaimed by the defendant in this case. So once we've dealt with those rational justifications and shown that they hold no water, the next question is, was it designed for a protectionist purpose? Because that's not a legitimate State interest. Laws regulating entry into an occupation must be rationally related to fitness and competition. And that's what we have here. The law does not regulate, does not ensure a person's fitness or capacity. It was designed on the undisputed evidence in this record simply to protect licensees against fair competition by entrepreneurs like Alan Merrifield who want to use non-pesticide, non-dangerous methods on pigeon works, on pigeon projects and structures in California. So with one concluding point is that in Craigmont or in Cornwell, rather, the court found that what was happening was that people who dealt with hair braiding were being required to take an examination that had about 10 percent of the questions relevant or the 10 percent of the educational materials relevant to their practice. Here we have 8 percent by our count, 12 percent by the district court's count. Either way, it's very close, and it shows that this license was designed for exterminators. That's what it was designed for. And it's being applied to people who aren't exterminators, who put up screens and spikes to keep birds and mammals. But to exclude them from competition? That's right. To protect those who had licenses from having to compete against those who don't have licenses for pigeon, rat and mouse exclusion work. Was this evidence made available in the trial court? Yes, it was, Your Honor. And if you'd like the citations to it, it appears at the excerpts of record at pages 46 or 46 to 47, page 66, page 75. That's Mr. Paulson's testimony, and that was supported by our own expert witness at the excerpts of record pages 14 and 15. Explain who Eric Paulson is. Eric Paulson. I'm sorry. Eric Paulson is a State's expert witness who testified. A State's expert. That's right. He testified the distinction was irrational. That's right. When he was asked four times, I believe it was, under oath, that he acknowledged that requiring the license for people who deal with pigeons but not for people who deal with other pests is positively irrational and, in his view, endangered the public health and safety. What he would think would be the best thing would be not to exempt anybody. Exactly. Because of all the risks. So doesn't that argument tend to say, okay, well, perhaps the State should not have But that doesn't mean that they have they don't lack a rational basis for including the rats, pigeons, and mice. I'm not really sure I follow, Your Honor. What I think it shows you is that this exemption in this definition of vertebrate pests was designed to protect licensees with regard to the most common vertebrate pests, the ones that are the biggest part of their business. That's what Mr. Paulson testified to and what is supported by our own witnesses. And that shows that both the licensing examination itself and the law that requires it work in conjunction to create an occupational licensing scheme that is not rationally related to a person's fitness or capacity to practice. What the State was trying to do in exempting certain practitioners was to say, look, if you're going to use dangerous chemicals, you need to know how to do it in order to not endanger the public. And that is a perfectly rational scheme. But by then saying, but if you're doing these kinds of animals, then you need a license which, you know, doesn't test your fitness or capacity. That's where the problem starts. Okay. I'll see you. You indicated you might want to reserve time. Yes. Thank you. You may do so. We'll hear from the State. May it please the Court. My name is Diane Sokoloff. I'm a Deputy Attorney General, and I represent the Structural Pest Control Board. Sokoloff. A or the? I'm sorry? A, deputy, or the? I am A, Deputy Attorney General. I'm not the. Each in our view are equally important. Thank you. I want to start by addressing a point that was raised. There are many points raised by my opposing counsel that I'd like to address, but one very important one seems to be at the crux of this issue, and that is that what we're talking about here is one profession. It is a single profession, and that profession is structural pest control. In this case, it's about a licensing requirement for one profession to protect the consumer and the health and safety of the public. Is your opponent correct that the State disavowed as a rational basis the consumer education stuff? No. My opponent, and this is cited in my brief, my opponent uses the word occupational. There was an occupational analysis, and that analysis was to determine the types of questions that would be on the test. That analysis did not have as a subject consumer education, nor, therefore, do the questions on the test focus on consumer education. But as stated in my brief, consumer education, those two facts don't mean that consumer education isn't a proper subject area for the people who are engaging in structural pest control. In fact, it does help the consumers for these people to be aware of the risks and the health hazards that are involved in this one profession of structural pest control. Counsel, you keep using the word one profession, and when I hear you say that, immediately it brings me to the Cornwall case where the same argument was made. Cosmetology is one profession, and if you're a braider or not, you're part of the same profession, and there the Court held that that's not true. That's true, Your Honor. The Court did hold in that case that there was not one profession because what they found was that the hair braiding did not fall into the realm of the cosmetology profession because there was minimal crossover between what the hair braiders did and what the rest of the cosmetologists do. But in this case, there is a considerable amount of crossover. One very important area where there is crossover is in the definition that goes to the heart of the one profession of structural pest control, and in that definition in Business and Professions Code Section 8505, it specifically states that structural pest control, well, I'm paraphrasing, but structural pest control includes both the use of pesticides to eradicate infestations and the use of mechanical devices to eradicate infestations, and that is exactly what appellants do. So appellants are part of the whole structural pest control. The problem I have with that analysis is it's a bootstrap analysis. You decided that there is a profession, and then you have indicated that there are several parts of the profession. His point is that there is a cleavage between the two parts, and the State doesn't recognize that, and brings him back to the cosmetology argument. Well, I haven't decided that there are two professions, two portions of a profession in one. The legislature has, and the legislature did that in Section 8505. Well, his whole point is that this is an irrational classification, and the legislature sometimes makes mistakes. Well, the legislature's effort here is if we look at this statute and we turn it upside on its face, what we're looking at, and when I'm talking about the statute, I'm talking about the exemption. Okay. Now, if you turn it on its face, what really, what it is, is a small exemption for a group of pest control operators that deal with non-pesticides and with a certain vertebrate pests, and those pests were defined in Section 8555G as raccoons, squirrels, bats, et cetera, what was specifically excluded from that definition of vertebrate pests for purposes of application of this statute were mice, rats, and pigeons. All right. So there we go. So they're the same profession. We're talking about the same group of people that do not use pesticides, but the legislature excludes mice, rats, and pigeons from the exemption, but includes without limitation bats, raccoons, skunks, and squirrels. Correct. And the thing that I'm having a problem with is like the converse of my last question, which is I don't see any reason why, and I really need you to give me a good one, why you would exclude mice, rats, and pigeons, but not all the others when they're the same category of non-pesticide users. Well, they are non-pesticide users. Where the line is drawn is between those predominantly structural pests, which are mice, rats, and pigeons. They are the most common and destructive structural pests, and that was stated by both sides' experts. And because they're the most common ---- And is that based on some kind of statistics? I mean, I lived in a house near the mountains, and we had lots of problems with raccoons, skunks, and squirrels, but none with mice, rats, or pigeons. Well, it is ---- it was undisputed. Both sides' experts stated that mice, rats, and pigeons are the most common and destructive structural pests, so that is not a facted issue. And because of the fact that mice, rats, and pigeons are the most common and destructive structural pests, those three groups of ---- those three vertebrate types of pests harbor viruses, diseases, and ectoparasites, they create a significant potential threat to the public for exposure to those particular diseases, viruses, et cetera. And just by numbers alone ---- So what does that have to do with making a distinction as to, I mean, within the class of people that don't use pesticides to deal with this? Well, just preliminarily, the legislature is allowed to draw lines. I know all the law on this. I know all the law. I know all the law on line drawing, inclusivity, over and over again. Under-inclusiveness, under-inclusiveness, okay, we know the law. Okay. Give me the articulation of the reason for taking non-pesticide people and dividing the people who have to have the branch two license by the nature of the pest. Okay. Let me first start with saying that from 1941, that the law in 1941 was that all structural ---- Everybody was regulated. Everybody was regulated. Okay. So the legislature may have to say, now, there are no specific ---- there is no legislative history on the reasons, the particular reasons why. That's irrelevant. That's constitutionally irrelevant. Legislative history is constitutionally irrelevant. Okay. So you have your expert that said, well, this came about because somebody from the wine industry wrote and said they need to be able to deal with the bats, and, right, we have the letter. We have your expert who said that this was ---- there were some particular people who came and asked for an exemption and that there was actual economic barrier reasons for not giving the exemption more broadly. That's Eric Paulson's testimony. And he said it's irrational. Well, Eric Paulson said it's irrational, but that needs to be viewed contextually. And when you view his statement contextually, you were correct when you said that his opinion is that there should be complete regulation. There should not have been an exemption. Right. So what's the rational basis for not ---- for excluding these other people? Because these other people are ---- these other people who are ---- whose target are these vertebrate pests, the vertebrate pests do not potentially expose the public to the health ---- to the amount of health and safety risks that the other excluded pests do. It's a number. It's a numbers game. And the legislature ---- Is this because there are more pigeons than seagulls? There are more pigeons that invade structures than there are pigeons. And what we're talking about here is the Structural Pest Control Board. It's in their interests to regulate that which is ---- that which affects their realm. And their realm is structures. Are there findings to that effect somewhere, either by the State or in Judge Schwarzer's opinion and order? When you say to that effect, do you mean to the ---- that there are more mice, rats and pigeons affecting structures? Well, more pigeons than seagulls. That was the question from my colleague. Well, I can answer ---- and I want to know what's the source of that assertion. The source of that assertion is both sides' experts saying that mice, rats and pigeons are the most common and destructive structural pests. So if they are the most common ---- Yeah, but there's no finding with respect to seagulls. We're comparing pigeons to seagulls. And your own expert said there was no rational basis for differentiating between pigeons and seagulls. Is that correct? I'm not exactly sure under what context my expert stated that there was no reason to differentiate. There is a reason to differentiate when it comes to their affecting structures. And the reality is that pigeons affect structures in a more severe way than seagulls. In fact, my expert did say that that is one of the main reasons why there are potential problems in restaurants, because of what pigeons carry and the diseases that they can transmit. But didn't he say that in a perfect world, seagulls would be included, and that excluding them from licensing requirements, affects, endangers the public health? I believe he did say that it would be better to regulate everyone. And what we have here is the legislature drawing a line. And really the question is whether there is a rational basis to still continue to require mice, rats and pigeons to be, or not mice, rats and pigeons, but structural pest control operators targeting mice, rats and pigeons to be regulated. And there could have been a risk analysis. The legislature could have undergone a risk analysis to determine how much the public health and safety was going to be affected by exposure, and just by virtue of the fact that mice, rats and pigeons in number are more significant, a number affecting these structures, that it protected the health, safety and welfare of the public to continue to legislate, to continue to regulate these people versus a relatively minimally intrusive, rarely and incidentally existing in structures, that other group, they were collaterally appearing in structures. So they consisted of a negligible proportion that would affect the public health. Well, you're referring to the potential rationale of the legislature. There's also a problem in state legislatures, and that is the power of the lobby. And it could just as easily be that the pest control companies, which I gather is what Mr. Sandifer suggests is the favorite element here, perhaps the pest control companies might have a stronger lobby, in which case they might be persuaded to make a distinction which conceivably would not survive rational basis. So my question to you is, to what extent did Judge Schwarzer look at this question about dividing up the trade? I think that was the word, those are the words that Mr. Sandifer used, that this is really, you know, nothing more than economic protectionism of a particular entity, particular class of companies. I think when my opponent talked about the Craig Miles case, there is something very significant, and that is it's a two-step process. The first is to determine whether there is a rational basis. And after you determine that there is not, then you go into the question as to whether there is economic protectionism. In this case, the court down below didn't have to get to that second step, because there was a finding that there was a rational basis. So if we're not persuaded by Judge Schwarzer's conclusion with respect to rational basis, what do we do? Send it back to him for trial, then, on the issue of whether there is economic protectionism? No, because this case, this is, this doesn't, economic protectionism does not exist in this case. If you follow my opponent's reasoning You just told us he never had to reach that issue, so how do we know if it's here or not? Well, because based on my opponent's argument, he said that there is economic protectionism because they made a law that now requires the group, the talents get a license. He's suggesting that competitors carved up the market here. That's what he's saying, that pest control companies didn't like the competition from his clients, and that's what happened. I mean, we're cutting to the chase here, and the State can prevail if it can survive economic, or if it can survive rational basis, but we're having some troubles in this area. Well, with economic protectionism, I think Powers, the case of Powers v. Harris is instructive, because Powers v. Harris parted company with Craig Miles on that very issue, and, in fact, it's a case where there is economic protectionism, and I think that case is instructive. It's a Tenth Circuit case, and it did part company with the Sixth Circuit, Craig Miles holding. Let me ask you about Judge Schwarzer's holding, because you said that, you made the blanket statement that rats, mice, and pigeons are the most common. Well, he makes this statement when it's kind of tautological, actually, his reasoning. He says that this regulation, that the State legislature could have reasonably found that this regulation would further the State's legitimate interest in consumer protection and the public health and welfare. And then he says, it is rational to think that rats, mice, and pigeons are overwhelmingly common. He says that rats, mice, and pigeons are the most common vertebrate pests infesting structures, and that, in comparison, other vertebrate pests tend to be present inside structures rarely and incidentally. It is rational to think. Is he basing that statement on any facts? He might be, and if he is, that's okay, because he can... What's the record here? Why is that rational to think that? Are we just pulling that out of... I don't know that. When you read the passage... It might be irrational to think that. Well, where is it? It's in the record. Where in the record? Can you give us the ER site? I can. Well, I can tell you that Expert Paulson and opposing counsel's expert testified that those three pests were the most common and destructive structural pests. It's also a statement made by Ms. Okuma. I think Blair's declaration may be in tab 92 or tab 115. Paulson's declaration is in tab 117 of the supplemental excerpts of the record. Thank you, counsel. Your time has expired. Mr. Sandifer, I believe you have some reserve time. Thank you, Your Honor. Just a couple of quick points. First, the State does not treat this as a single profession. The State has divided this into two professions. That's why we have the exemption for anybody who treats anything other than a pigeon, rat, and mouse. But even if these were treated as a single profession, the Cornwell court said, quote, that even if Cornwell were defined to be a cosmetologist, the licensing regimen would be irrational as applied to her because of her limited range of activities. Even if she fell under the general description of a cosmetologist, it's not rational to require her to learn a huge amount of skills and information that she simply would never use. So the contention that this is simply a single profession, I think, overlooks the important details in this case. As to consumer education, again, the defendant disclaimed that references at ER 128, page 108 of the excerpts of record when Kelly Okuma said, an applicant's ability to educate consumers is not part of the occupational analysis, and therefore there are no examination questions regarding the ability to educate consumers. So the test does not evaluate a person's fitness or capacity. Now, that goes to the test. I had understood your argument in your opening argument to be that the State, as an entity, had abandoned the notion that consumer education satisfied the rational basis test, and that's not what that testimony says at all. Oh, I'm sorry. That's not what I'm trying to say. What happened is that Kelly Okuma is a registrar of the State Pest Control Board, and she testified in that capacity that educational, that educating the consumer is not part of what a practitioner is expected to do enough that it would have a place on the examination. And so the examination doesn't test a person's ability to do that. I understand the difference now. Okay. Finally, with regard to the Powers case, which was brought up quickly, we would urge the Court to follow the Craig Miles line of, to follow the Craig Miles decision rather than Powers. There is a conflict between the circuits on that point. The Supreme Court denied cert in Powers. Powers declared that mere protectionism alone is a legitimate State interest, which raises serious questions, because the rational basis test has always been understood since its inception to require a rational relationship to a legitimate State interest in protecting the public health, safety, and welfare, not merely in serving private benefits at the expense of other people. With regard to the question that had been brought up about whether pigeons are more common or less common, I don't either, I don't recall either whether there's any testimony to that effect in the record, and I certainly couldn't point the Court to it. But that really isn't an essential point here, because the question isn't whether pigeons or seagulls are more common. The question is whether there's a rational basis for requiring a person who puts up spikes or other devices to keep pigeons off the building needs to have training in the lifespan of moths and the dangers that certain chemicals impose, whereas a person who puts the same spikes on the same building to keep seagulls off of it doesn't need to know that information. Yes. I mean, the reason I focused on it was that both Judge Schwarzer and your opposing counsel used that as the rational basis. That's right, Your Honor. There's more common, but there doesn't seem to be anything in the record that. No, they simply assume that. Thank you, Your Honor. Thank you, counsel. The case just argued will be submitted for decision, and the Court will take its morning
judges: O'scannlain, Hawkins, Wardlaw